Filed 5/29/13  P. v. Scroggins CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D061289 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCS238857) |
| LEONARD EARL SCROGGINS, JR., | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, George W. Clarke, Judge.  Affirmed as modified.

Susan K. Shaler, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Peter Quon, Jr., and Christopher P. Beesley, Deputy Attorneys General, for Plaintiff and Respondent.

INTRODUCTION

A jury convicted Leonard Earl Scroggins, Jr., of a committing a forcible lewd act on a child (Pen. Code, § 288, subd. (b)(1);[1] count 1), attempted kidnapping for purposes of committing a lewd act on a child (§§ 209, subd. (b)(1), 664; count 2), assault with a knife (§§ 245, subd. (a)(1), 1192.7, subd. (c)(23); count 3), robbery (§ 211; count 4), kidnapping for robbery (§ 209, subd. (b)(1); count 5) and two counts of attempted robbery (§§ 211, 664; counts 6 and 7). As to counts 1, 2, 5 and 6, the jury found true allegations Scroggins used a knife in the commission of the crimes (§ 12022, subd. (b)(1)). As to counts 5 and 6, the jury also found true allegations Scroggins inflicted great bodily injury (§ 12022.7, subd. (a)). Scroggins additionally admitted having two prior strike convictions (§§ 667, subds. (b)-(i), 1170.12), two prior serious felony convictions (§ 667, subd. (a)(1)), two prior prison commitment convictions (§ 667.5, subd. (b)), and a prior sex crime conviction (§§ 667.61, subds. (a), (c) & (d), 667.71, subd. (a). The trial court sentenced Scroggins to an indeterminate sentence of 150 years to life plus a determinate sentence of 45 years.

Scroggins appeals, contending: (1) the trial court erroneously denied his motion to suppress evidence obtained in violation of *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*); (2) the trial court failed to hold a hearing to determine whether he was competent to stand trial; (3) the trial court erroneously denied his motion under *People v. Marsden* (1970) 2 Cal.3d 118 (*Marsden*) for substitute counsel; (4) there was insufficient

---

[1] Further statutory references are also to the Penal Code unless otherwise stated.

evidence to establish the requisite lewd intent for counts 1 and 2; (5) the jury instructions on the union of act and intent were incomplete as to count 1; (6) the prosecutor erred during closing argument by asserting the jury should first reach conclusions as to the greater offenses before deliberating on the lesser included offenses; (7) his trial counsel provided him with ineffective assistance; and (8) the cumulative effect of these errors deprived him of due process of law and a fair trial.

The People concede and we agree the trial court committed prejudicial instructional error as to count 1. We, consequently, exercise our discretion under section 1260 to reduce the conviction in count 1 to attempted forcible lewd act with a child (§§ 288, subd. (b)(1), 664). In all other respects, we affirm the judgment.

## BACKGROUND

*Prosecution's Evidence*

### *Count 7 - Attempted Robbery*

As 17-year-old Cynthia H. walked by Scroggins's parked van one evening on her way home, Scroggins got out, demanded she give him her purse, and tried to grab it from her. She backed away from him, screamed, then turned and fled.

### *Counts 5 and 6 - Attempted Kidnapping for Robbery and Attempted Robbery*

A short time later, Scroggins went up to 44-year-old Maria Lucio-Stoltz (Stoltz) while she was walking to work and grabbed her by the hair. She yelled as he dragged her about 40 feet to his parked van. When they reached the van, he opened the door and tried to lift her into it, but he hit her in the head and she fell. He demanded money from her and she told him she did not have any. At some point, Stoltz seriously slashed her hand

3

on a knife Scroggins had with him and she started bleeding badly. He noticed the blood, became nervous, then left her, and drove away in his van.

*Count 4 - Robbery*

The next afternoon, as 19-year-old Maricela Barron walked past Scroggins's parked van on her way home, he got out, grabbed her purse from behind and demanded she give it to him. They struggled for the purse for several seconds until Barron relented and let Scroggins take it. After getting the purse, Scroggins threw it in his van and drove away. Barron memorized the van's license plate number and immediately sought help.

*Counts 1, 2 and 3 - Lewd Act on a Child, Attempted Kidnapping to Commit a Lewd Act on a Child, and Assault with a Deadly Weapon*

Later the same afternoon, 13-year-old Guadalupe P. was walking home in her school uniform carrying a backpack and a sweater. She saw Scroggins's van parked in the middle of the driveway to her apartment complex. He sat in the driver's seat and stared at her. As she turned into the driveway and passed by the van, she heard a heavy sound behind her. Then, Scroggins reached out from behind and grabbed her. He held her left hand behind her with one of his hands and held a knife to her neck with his other hand. He told her to get into the van or he would cut her. Guadalupe reached up and felt the knife, cutting her finger. As Scroggins tried to move her toward the van, she elbowed him. He let her go and she ran home. During the encounter, Scroggins did not try to take her backpack nor did he demand she give it to him. He also never asked her for any money.

4

DISCUSSION

I

*Denial of Motion to Suppress for Miranda Violation*[2]

A

1

At some point after his arrest, Scroggins went to a hospital for an evaluation. When he returned to the police station, two detectives began interviewing him. Before the interview, the detectives asked him if he was feeling better and whether he had been given any medication. He told them that he was feeling better, he was "alright," and he was not taking any medication. The detective also asked him if he wanted them to remove the handcuffs he was wearing. He responded, "No, I'm alright."

After first obtaining some general background information from him, the detectives gave him the advisements required by *Miranda*, *supra,* 384 U.S. 436 (*Miranda* advisements). Scroggins acknowledged he had heard the *Miranda* advisements many times before. He also acknowledged he understood the *Miranda* advisements.

The detectives explained they wanted to talk to him about the events preceding his arrest and asked him whether that was okay with him. He replied, "Yeah." Scroggins told the detectives he traveled to San Diego from northern California because he was

---

[2]    The record on appeal initially contained only the redacted version of Scroggins's interview with police detectives shown to the jury. As the trial court decided Scroggins's *Miranda* claims based on the entire interview, we obtained, reviewed, and based our summary and analysis on the entire interview. The redacted version did not include any discussion of Scroggins's past convictions or any crimes he may have committed against his niece.

"having problems" and wanted to cross the border into Mexico, but he did not have a passport.

He ran out of money, so he snatched Barron's purse. He took $42 dollars from it and threw away her credit cards and other items. He then drove around and looked for somebody else to rob.

The detectives told him a teenage girl with a backpack (Guadalupe) reported he had assaulted her with a knife. The detectives asked him if he remembered her getting cut. Scroggins said he did not remember having a knife and denied cutting anyone or having any knowledge of the incident.

The detectives praised Scroggins for honestly telling them about what happened with Barron and empathized with his situation. He told them, "[T]he only reason I'm talking to you cause I usually just plea the 5th. Because I know that once I got pulled over, got stopped . . . I'm just getting [a] life sentence anyway." He also lamented not being able to "make it" outside of prison.

After again praising Scroggins for his honesty and empathizing with his situation, the detectives told him they wanted to clear up what happened with Guadalupe because they believed her blood was going to be found on his clothes and his knife. He responded, "I'm fittin', I'm fittin' to get a life sentence already, anyway, from, from the first girl that I told you about that, that I just told you I robbed."

They asked him again to tell them what happened. They also told him they knew he did not rape or kidnap Guadalupe, but they only had her side of the story. He replied, "No, I understand all that."

6

They suggested there might have been a miscommunication between him and her and he replied, "I mean, what miscommunication is you talking about? You said that she said that I tried to rob her." He went on to explain he was just trying to rob people to get across the border and then had a "break down in [his] mind" and "just wasn't thinking."

When the detectives asked him again if he would tell them what happened with Guadalupe, he responded, "No, I'm not fittin' uh, not fittin' to going into it." The detectives then asked him, if he did not want to go into the details, whether he could at least admit he had the knife and knew she got cut. But, he said, "No."

The detectives again expressed their appreciation of Scroggins's honesty about robbing Barron. They also acknowledged Scroggins could choose not to talk to them about Guadalupe and told him "that's cool." However, they knew it was her blood on his knife and his pants and they wanted to hear from him what happened for her sake because she was 13 years old and the incident was going to change her life forever.[3] Scroggins responded, "I told you [unin] nah man" and then reiterated he was just trying to rob people for money.

Switching topics slightly, the detectives asked him if he had tried to rob anyone else. He admitted he tried to snatch the purses of two other women at knifepoint, but they screamed and ran away just as Guadalupe had done. He also admitted using a knife to rob Barron.

---

[3]     The DNA of the blood found on Scroggins pants actually matched Stoltz. The detectives did not know about that crime at the time they interviewed Scroggins as it occurred in another jurisdiction.

After asking Scroggins for a few more details about the unsuccessful robberies, the detectives stated they wanted "to go back to the girl with the backpack today." Scroggins responded, "Yeah." The detectives told him that she could be emotionally scarred by what happened and it might help her if he would tell them what happened and that he was sorry. They then asked him directly to tell them what happened with her. He replied, "Um, no."

They asked him if he was worried and he said he was not because he was going to get a life sentence regardless. They then asked, "well if that's the case . . . what happened with this girl?" Scroggins replied, "I don't know she was thirteen, man." They then asked if he told her to get in his car. He said he did not.

They asked him what he did tell her and he replied, "I told you, I'm not fittin' to talk about it." He then said, "If you ain't got nothing else to talk about man, I'm, I'm ready to go to jail."

They told Scroggins they were asking the questions because they wanted to be able to go to Guadalupe and make things right. Scroggins replied, "I can't make it right." The detectives disputed the point, but Scroggins insisted, "No, you can't make it right. You just got to do, you got to deal with [the] consequences."

They continued to impress upon him how important it was to be able to help her and he said, "I don't know if I'm going to discuss that man." They then asked him, since he was sure he was going to get a life sentence, why he did "not put it all out on the table" and "take responsibility for . . . this other thing," because the evidence was going to prove

8

what happened. He said, "No" and repeated he was just trying to rob people for money to cross the border and did not know Guadalupe was 13.

They accepted his statements and asked him again to tell them what happened and whether she got cut. He said he did not remember her getting cut. They then asked him to explain the blood on him. He told them that because of his criminal history, "it don't really matter man." They responded, "Then why not clear up this last one." He told them it was already cleared up—he was just trying to rob people for money to get across the border. He once again denied knowing anything about the incident with Guadalupe or about her getting cut.

The detectives told him they understood he was trying to rob people, but they believed he did not want to tell them about the incident with Guadalupe because he knew he cut her and he knew he tried to get her in the car. They told him they had seen his criminal history and knew he was a rapist and a child molester. He denied ever molesting anybody and told them, "you can think what you want to think."

The detectives pointed out that Guadalupe was not a sophisticated teenager. She was a "little girl still." They said she told them that while he held her, he had the knife to her throat and told her to get in the car. They told him he did not have to admit the crime because the evidence would prove it, but it was important for people to take responsibility for their actions. They also told him they knew he was wanted for molesting his niece. He acknowledged, "Yeah, I know that is why [I] broke the ankle bracelet and left."

9

They then asked him why he molested his niece and he denied he did. He also denied knowing why his niece accused him of molesting her. According to him, she said he gave her a hug and then slapped her on the butt. The detective leading the interview then asked, "Did you tap her butt? Was it, did you tap her butt and it wasn't sexual but she thought it was? I mean, is that what happened? See [Scroggins], this is where . . . the problem is, okay. When we go to talk about this stuff that's related to sex or related to kidnapping, you don't want to talk about it. And you know what your silence tells me more than what your mouth could." He responded, "Yeah."

The detectives assured Scroggins they were not going to think less of him because of what he was being accused of doing. Scroggins acknowledged and appreciated that they had been respectful to him during the interview. However, Scroggins again stated it did not matter because he knew he was getting a life sentence. The lead interviewer again stated, "If that's the case then let's clear this up."

After the detectives told Scroggins "it takes a really big man" to admit he has made mistakes and poor choices, Scroggins replied, "I'm just fucked up in the head, man. I just wasted, I just wasted all my life."

They asked him one more time to tell them what happened with Guadalupe and pointed out "it is obvious that you, you want to talk about it because you already started going on that road and talk about it." He told them, "it ain't that I don't want to talk about it, man, I just . . . ." He continued, "I'm a piece of shit, that was a really shitty thing to do that, that's why. It wasn't, it wasn't necessary . . . I just, I just acted mentally weak, that's all. I just, I just acted, I just acted mentally weak."

10

They asked him to "[t]ake us there man, tell, take us to how you're feeling, what happened[,] what [your] experience was." He told them, "Nah, cause that ain't, that's, that's not uh, I, I'm not gonna do that. ¶ . . . ¶ I'm not fittin' to do that."

They asked him why, and he told them, "Cause like I said man, I won't, when I seen her, man, I mean, for any reason I uh, (unin) I didn't know she was thirteen but then again, I ain't going to lie, I knew she wasn't eighteen she got her backpack on. I came up on her, I came up on her with a knife. I didn't know, I didn't know she got uh, that she got her finger cut. I didn't know all that but I mean, that's the honest god truth, cause like I said I was standing behind her. And you know, just like I said, I just, just a momentary, just, just a momentary, just a piece of shit-ass decision man, when I tried to get her into the car. And whether she believes it or not she didn't stop me I stopped myself and that ain't trying to take no credit from her I just stopped I just said, 'just stop man, just stop man, just let her go.' I didn't chase after her, I didn't stab her, I didn't, but I just stopped, just let her go, man. But uh, that was it, that was some piece of shit . . . cause you right, it wasn't about, it wasn't about no survival. It was just from some sick, it was just sick and I was mentally weak instead of ignoring it, I was just like well, 'fuck it my life over anyway.' That was just . . . some shitty shit. I mean, ain't nothing I can do. You know. I'm, I'm glad, and whether you believe this or not, that it didn't go through. I mean. I'm, I'm glad that it wasn't successful. I'm glad that it didn't go through. I don't know what else to do, I mean, I can't, it's nothing I can, I don't believe there's nothing I can say that I will help her get over it, you know, so I mean, you know, I mean, of course I'm going to

11

say I'm sorry of course I'm going to say I'm sorry but a lot of good that is going to do, you know what I mean."

After the detectives praised him for taking responsibility, they offered him an opportunity to write an apology to Guadalupe. He declined the offer and the interview ended.

2

Before trial, the prosecutor moved to admit Scroggins's statements to the detectives. Scroggins, however, moved to suppress the statements related to his actions toward Guadalupe, arguing these statements were inadmissible because he had selectively invoked his right of silence. The trial court granted the prosecutor's motion and denied Scroggins's motion, finding that although Scroggins stated several times he was "not fittin" to talk about the incident with Guadalupe, he continued to voluntarily answer questions about the incident and never clearly invoked his right of silence.

B

Scroggins contends we must reverse his convictions for counts 1 and 2 because his statements to detectives about his actions toward Guadalupe were involuntary and the trial court's failure to suppress them violated *Miranda* as well as his constitutional rights to remain silent and to due process of law. "Under California law, issues relating to the suppression of statements made during a custodial interrogation must be reviewed under federal constitutional standards." (*People v. Nelson* (2012) 53 Cal.4th 367, 374 (*Nelson*).) To combat the pressures of custodial interrogation and permit suspects a full opportunity to exercise their privilege against self-incrimination, *Miranda* requires they

12

be apprised of their rights to remain silent and to the assistance of counsel. (*Ibid.*) If a suspect indicates in any manner a desire to remain silent or to consult an attorney, the interrogation must end and any statement obtained from the suspect after that point may not be admitted in the prosecution's case-in-chief. (*Ibid.*)

Nonetheless, a suspect may waive these rights. (*Nelson*, *supra*, 53 Cal.4th at p. 374.) To establish a valid waiver, the prosecution must show by a preponderance of the evidence the waiver was knowing and voluntary. (*Id.* at pp. 374-375.) Whether a waiver is knowing and voluntary is assessed based on the totality of the circumstances surrounding the interrogation. (*People v. Sauceda-Contreras* (2012) 55 Cal.4th 203, 219.) "The waiver must be 'voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception' [citation], and knowing in the sense that it was 'made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.' " (*Ibid.*)

The parties do not dispute Scroggins knowingly and voluntarily waived his right of silence[4] at the outset of the interview. The record demonstrates as much. At the time of his arrest in this case, he was 32 years old. He had numerous prior arrests and convictions, including convictions resulting in prison commitments. When the detectives provided him with the requisite *Miranda* advisements, he acknowledged having heard them many times before. He further indicated he understood the *Miranda* advisements and explicitly agreed to speak with the detectives. In fact, he told them he normally

---

4     We do not discuss the validity of Scroggins's waiver of his right to counsel as it is not at issue in this appeal.

13

"plea[ds] the 5th," but he decided to speak with them because he knew he was facing a life sentence due to his criminal history. His candid responses to their subsequent questions further indicated he understood the *Miranda* advisements and waived his rights.

The only question is whether, after having initially waived his right of silence, Scroggins later selectively or partially invoked it as to his actions with Guadalupe. Whether suspects may selectively or partially invoke their right of silence is a debatable issue in California as neither the United States Supreme Court nor the California Supreme Court has directly addressed it. One California appellate court has concluded there is no right of selective silence. (*People v. Hurd* (1998) 62 Cal.App.4th 1084, 1093-1094; see Note, *"You Have The Right to Remain Selective Silent": The Impractical Effect of Selective Invocation of the Right to Remain Silent* (2012) 38 New Eng. J. on Crim. & Civ. Confinement 177.) However, the Ninth Circuit disagrees. (*Hurd v. Terhune* (9th Cir. 2010) 619 F.3d 1080, 1087.) We need not decide the matter because, even if we assume suspects are constitutionally permitted to selectively or partially invoke their right of silence, we are not persuaded Scroggins did so in this case.

Once a suspect waives the right to remain silent, any subsequent assertion of the right must be articulated " 'sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be' " an invocation of the right. (*Nelson*, *supra*, 53 Cal.4th at pp. 371-372, citing *Davis v. United States* (1994) 512 U.S. 452, 459, & *Berghuis v. Thompkins* (2010) 560 U.S. 370 [130 S.Ct. 2250, 2260].) A suspect's statement is not sufficient if a reasonable officer would have only understood from the statement that the suspect *might* be invoking the right. (*Nelson*, at pp. 376-377.)

14

" '[I]f an ambiguous act, omission, or statement could require police to end the interrogation, police would be required to make difficult decisions about an accused's unclear intent and face the consequence of suppression "if they guess wrong." ' [Citation.] In such circumstances, suppression of a voluntary confession 'would place a significant burden on society's interest in prosecuting criminal activity.' " (*Id.* at p. 378.)

Here, although Scroggins declined several times to talk about his actions with Guadalupe, he never explicitly invoked his right of silence. In addition, he freely discussed his criminal history throughout the interview, including acknowledging he was a registered sex offender and admitting he had purposely removed his GPS tracking device and absconded after his niece accused him of molesting her. He also readily admitted his robbery crimes against the other victims, including his use of a knife to threaten or scare them.

Moreover, when the detectives first broached the topic of his actions with Guadalupe, Scroggins did not tell them he did not want to talk about this topic. Instead, he denied remembering or having anything to do with this victim. A short time later, Scroggins told the detectives he normally "plea[ds] the 5th," indicating he knew how to explicitly invoke his right of silence if he desired. Yet, when they asked him again to tell them what happened with Guadalupe, he did not "plead the 5th." Instead he told them he was "fittin' to get a life sentence already, anyway," suggesting he did not want to talk about the crime because he did not see the point.

After that, he vacillated a few times between declining to speak about the matter to insisting he was just trying to rob people to obtain the means to cross the border. When

15

the detectives subsequently asked why he would not talk about the matter if he was not worried about what would happen to him, he did not take that obvious opportunity to indicate he was invoking his right of silence. Instead he responded, "I don't know she was thirteen, man," suggesting he was declining to speak because of embarrassment or similar reasons.

When the detectives followed up by asking whether he told Guadalupe to get in his van, he became frustrated, declined again to speak about the matter, and stated, "If you ain't got nothing else to talk about man, I'm, I'm ready to go to jail." California courts have held similar expressions of momentary frustration to be insufficient to constitute an unequivocal and unambiguous assertion of the right of silence. (*People v. Williams* (2010) 49 Cal.4th 405, 433-434; *People v. Jennings* (1988) 46 Cal.3d 963, 977-979; *People v. Thomas* (2012) 211 Cal.App.4th 987, 1005, 1007.)

Furthermore, Scroggins continued to voluntarily respond to the detectives' questions, telling them he could not make things right for Guadalupe and he did not know she was 13. He then flip-flopped between stating he did not know whether he was going to discuss the matter, to declining to discuss the manner, to insisting he was just trying to rob people, to opining it did not matter what he said, and back to insisting he was just trying to rob people. At no time did he state he wanted to "plead the 5th" or otherwise explicitly exercise his right of silence. He also did not ask the detectives to stop questioning him about Guadalupe nor did he stop responding to their questions about her.

Then, after the detectives told him they knew all about his criminal history, knew all about his niece's accusations, and did not think any less of him, he indicated he was

16

not declining to talk about his actions toward Guadalupe because he did not want to talk about them. Rather, he was declining to talk about them because he was ashamed and there was nothing he could say to help her get over the incident. Given this acknowledgment and the totality of circumstances leading up to it, we cannot conclude Scroggins unequivocally and unambiguously invoked his right of silence during the interview, whether selectively or otherwise.

We also cannot conclude Scroggins's statements about his actions with Guadalupe were involuntary or coerced. Generally, the law presumes "that an individual who, with a full understanding of his or her rights, acts in a manner inconsistent with their exercise has made a deliberate choice to relinquish the protection those rights afford." (*Berghuis v. Thompkins*, *supra*, 130 S.Ct. 2250, 2262.)

Additionally, the record shows the detectives did not promise Scroggins leniency or threaten him in anyway. Although he was handcuffed during the interview, the detectives offered to remove them at the outset of the interview and he declined the offer. He also acknowledged during the interview that the detectives had treated him respectfully and expressed his appreciation for their treatment. While the detectives encouraged him to discuss what happened with Guadalupe for her sake and his own sake, such tactics, when unaccompanied by either a threat or a promise, do not make a subsequent confession involuntary. (*People v. Gonzalez* (2012) 210 Cal.App.4th 875, 882-883.) Accordingly, we cannot conclude the trial court's admission of Scroggins's statements violated *Miranda* or Scroggins's rights of silence and to due process of law.

17

## II

### *Failure to Conduct Competency Hearing*

#### A

Before the preliminary hearing, Scroggins requested to substitute counsel under *Marsden*, *supra*, 2 Cal.3d 118, arguing his counsel was incompetently representing him and there was an irreconcilable conflict between them. In explaining these points, Scroggins told the trial court he had been diagnosed with "schizophrenic bipolar," had a lengthy history of mental health problems and treatment, and had requested his counsel obtain his mental health records from a prior prison commitment. He also told the trial court he heard voices and, consequently, took psychotropic medication. Although he acknowledged the medication generally worked fine, he claimed he started hearing voices again whenever he got into "a spat" with his counsel. He argued he could not have a workable attorney-client relationship if he kept hearing voices telling him to spit on or attack his counsel.[5] He acknowledged he did not know whether he would experience the same problem with another attorney.

#### B

Based on his revelations about his mental health during the *Marsden* hearing, Scroggins contends we must reverse his convictions because the trial court failed to declare a doubt about his competency to stand trial and order a competency evaluation. " 'Both the due process clause of the Fourteenth Amendment to the United States

---

[5] There is nothing in the record indicating Scroggins ever acted on such voices.

18

Constitution and state law prohibit the state from trying or convicting a criminal defendant while he or she is mentally incompetent.  [Citations.]  A defendant is incompetent to stand trial if he or she lacks a " 'sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—[or lacks] . . . a rational as well as a factual understanding of the proceedings against him.' "  [Citations.]

" 'Both federal due process and state law require a trial judge to suspend trial proceedings and conduct a competency hearing whenever the court is presented with substantial evidence of incompetence, that is, evidence that raises a reasonable or bona fide doubt concerning the defendant's competence to stand trial.  [Citations.]  . . . Evidence of incompetence may emanate from several sources, including the defendant's demeanor, irrational behavior, and prior mental evaluations.  [Citations.]'  [Citation.]  But to be entitled to a competency hearing, 'a defendant must exhibit more than bizarre . . . behavior, strange words, or a preexisting psychiatric condition that has little bearing on the question of whether the defendant can assist his defense counsel.  [Citations.]'  [Citation.]

" 'A trial court's decision whether or not to hold a competence hearing is entitled to deference, because the court has the opportunity to observe the defendant during trial.  [Citations.]  The failure to declare a doubt and conduct a hearing when there is substantial evidence of incompetence, however, requires reversal of the judgment of conviction.' " (*People v. Lewis* (2008) 43 Cal.4th 415, 524-525.)

In this case, Scroggins's remarks about his mental health tell an incomplete story.  The transcript of the *Marsden* hearing shows Scroggins remained focused and lucid

19

throughout, a conclusion supported by Scroggins's acknowledgment his medication was generally "working fine." In addition, at the time of the hearing, Scroggins was in the midst of a paralegal course and had done his own legal research in preparation for the hearing. He presented his various points articulately and intelligently, which both his counsel and the trial court remarked upon favorably. In presenting his points, he accurately discussed the two most serious charges against him, what the most likely defense to those charges was, and what case law supported the defense. He also accurately discussed the most likely avenue of attempting to suppress the statements he made to police detectives. It is readily apparent from the totality of his remarks that, notwithstanding any prior or ongoing mental health issues, he fully understood the nature of the legal proceedings against him and was more than capable of assisting his counsel in a rational manner. He, therefore, has not established his revelations about his mental health during the hearing required the trial court to order a competency exam.

## III

### *Denial of Marsden Motion*

### A

After hearing from Scroggins, then from defense counsel, and then from Scroggins again, the trial court denied the *Marsden* motion. The trial court found that, while there had been a few communication glitches between Scroggins and defense counsel, they did not warrant defense counsel's replacement. In addition, the trial court found defense counsel had properly represented him and would continue to do so. Finally, the trial court found Scroggins's concerns about hearing voices was not an appropriate ground for

20

replacing counsel because the trial court was not convinced the problem would not recur with new counsel.

B

Scroggins contends we must reverse his convictions because the trial court erred by failing to grant his *Marsden* motion after learning he was hearing voices telling him to spit on or attack defense counsel. More particularly, he contends this manifestation of his mental health issues presented an irreconcilable conflict between him and his counsel.

" ' "When a defendant seeks to discharge his appointed counsel and substitute another attorney, and asserts inadequate representation, the trial court must permit the defendant to explain the basis of his contention and to relate specific instances of the attorney's inadequate performance. [Citation.] A defendant is entitled to relief if the record clearly shows that the first appointed attorney is not providing adequate representation [citation] or that defendant and counsel have become embroiled in such an irreconcilable conflict that ineffective representation is likely to result." ' [Citation.] The decision whether to grant a requested substitution is within the discretion of the trial court; appellate courts will not find an abuse of that discretion unless the failure to remove appointed counsel and appoint replacement counsel would 'substantially impair' the defendant's right to effective assistance of counsel." ' " (*People v. Vines* (2011) 51 Cal.4th 830, 878, superseded by statute on another point as recognized in *People v. Robertson* (2012) 208 Cal.App.4th 965,981.)

Although Scroggins stated he heard voices telling him to spit on or attack his counsel whenever they had a spat, nothing in the record indicates spats predominated the

21

relationship or that Scroggins ever acted on the voices. In addition, when the trial court gave defense counsel an opportunity to respond to Scroggins's concerns, she never expressed any apprehension in continuing to represent him because of his mental health issues. Moreover, there is no indication in the record Scroggins's mental health issues impaired her representation of him. While defense counsel admitted having one miscommunication with Scroggins over whether he wanted to go to trial, the miscommunication was semantical and had nothing to do with his mental health issues. Further, as discussed *ante*, the transcript of the *Marsden* hearing showed Scroggins had no difficulty conveying and defense counsel had no difficulty understanding Scroggins's desired strategies to defend the case. Defense counsel also expressed a willingness to pursue these strategies at the appropriate junctures in the case. Thus, even if Scroggins's mental health issues presented a conflict, the record does not show they presented an *irreconcilable* one and we, therefore, cannot conclude the trial court abused its discretion in denying Scroggins's *Marsden* motion.

IV

*Insufficient Evidence of Lewd Intent for Counts 1 and 2*

Scroggins contends we must reverse his convictions for counts 1 and 2 involving Guadalupe because there was insufficient evidence he had the requisite lewd intent for these crimes. In deciding claims of insufficient evidence in criminal cases, " 'we review the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a

22

reasonable doubt. [Citations.] The standard of review is the same in cases in which the People rely mainly on circumstantial evidence. [Citation.] "Although it is the duty of the jury to acquit a defendant if it finds that circumstantial evidence is susceptible of two interpretations, one of which suggests guilt and the other innocence [citations], it is the jury, not the appellate court which must be convinced of the defendant's guilt beyond a reasonable doubt. ' "If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment." ' [Citations.]" [Citation.]' [Citations.] The conviction shall stand 'unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction]." ' " (*People v. Cravens* (2012) 53 Cal.4th 500, 507-508.)

In this case, the evidence shows that when Scroggins approached Cynthia, Stoltz, and Barron, he demanded money or attempted to take their purses. Conversely, when he approached Guadalupe, he did not do either. In addition, Guadalupe was an unlikely robbery target as she was younger than the other victims, she was wearing a school uniform, and she was carrying a backpack, not a purse. Moreover, Scroggins's encounter with Guadalupe occurred not long after he successfully robbed Stoltz of approximately $40. While $40 might not have sustained Scroggins for long, it would have addressed his immediate need for gas money and prevented him from being so desperate that he needed to rob a child for money. Further, the contrast between Scroggins's willingness to discuss his crimes against the other victims and his reluctance to discuss his crimes against Guadalupe support a finding the latter crimes were different in kind than the former. This

23

contrast, coupled with his admission his actions against Guadalupe were the product of a mental sickness and not for survival, would permit a reasonable jury to find he had the requisite lewd intent for these crimes.

V

*Incomplete Instructions on Union of Act and Intent for Count 1*

Scroggins contends we must reverse his conviction for count 1 because the trial court's instruction on the union of act and intent failed to convey to the jury that Scroggins's lewd intent had to coincide with his touching of Guadalupe. As instructed, the jury could have separated Scroggins's touching of Guadalupe, which occurred when he tried to kidnap her, from his intent to derive sexual gratification.

The People concede the error, but request that, instead of reversing the conviction, we exercise our discretion under section 1260 to reduce it to attempted commission of a lewd act with a child. Scroggins opposes this request, arguing we may not reduce the conviction because the jury's verdict does not necessarily encompass the requisite intent for attempt.

" '[U]nder Penal Code sections 1181, subdivision 6, and 1260, an appellate court that finds that insufficient evidence supports the conviction for a greater offense may, in lieu of granting a new trial, modify the judgment of conviction to reflect a conviction for a lesser included offense.' " (*People v. Bailey* (2012) 54 Cal.4th 740, 748.) In this context, we determine whether a lesser offense is included in a greater offense by applying the legal elements test. (*Id.* at p. 752.) This requires us to consider whether the

24

jury, in finding Scroggins guilty of committing a forcible lewd act on a child necessarily found all of the elements of attempting to commit a forcible lewd act on a child. (*Ibid.*)

Although some appellate courts have held an attempt to commit a crime is always a lesser included offense of the completed crime (see, e.g., *In re Sylvester C.* (2006) 137 Cal.App.4th 601, 609; *People v. Meyer* (1985) 169 Cal.App.3d 496, 506), both this court and the California Supreme Court have recognized that, because an attempt is a specific intent crime, an attempt is not necessarily a lesser included offense of a general intent crime. (*People v. Bailey*, *supra*, 54 Cal.4th at p. 752; *People v. Strunk* (1995) 31 Cal.App.4th 265, 271.) However, notwithstanding Scroggins's contrary arguments, this caveat does not apply in this case.

To be guilty of committing a forcible lewd act on a child, a defendant must have (1) used force, (2) to willfully touch any part of the body of a child under 14 years old, (3) with sexual intent. (§ 288, subd. (b)(1); CALCRIM No. 1111.) To be guilty of attempting to commit a forcible lewd act on a child, the defendant must have (1) intended to commit the crime and (2) taken a direct, but ineffective step toward doing so. (§ 21a; *People v. Davis* (2009) 46 Cal.4th 539, 606; CALCRIM No. 460.) Because the crime of committing a forcible lewd act on a child requires a willful act committed with a specific mental state, it is a specific intent crime and the jury was so instructed under CALCRIM No. 252. Thus, to convict Scroggins of this crime, the jury necessarily had to find he intended to commit the crime. Accordingly, attempting to commit the crime is a necessarily included offense and we may and do exercise our discretion under section

25

1260 to reduce the conviction in count 1 to attempted commission of a lewd act on a child.

As we have addressed this issue on the merits, we need not address Scroggins's contention his trial counsel provided ineffective assistance by failing to preserve this issue for appeal.

VI

*Prosecutorial Error*

A

1

During its closing instructions, the trial court informed the jury, "It is up to you to decide the order in which you consider each crime and the relevant evidence . . . but I can accept a verdict of guilty of a lesser crime only if you have found the defendant not guilty of the corresponding greater crime. [¶] . . . [¶]

"If all of you agree the People have proved beyond a reasonable doubt that the defendant is guilty of the greater crime, complete and sign the verdict form for guilty of that crime. [¶] Do not complete or sign any other verdict form for that count.

"If all of you cannot agree whether the People have proved beyond a reasonable doubt that the defendant is guilty of the greater crime, inform me only that you cannot reach an agreement and do not complete or sign any verdict form for that count.

"If all of you agree that the People have not proved beyond a reasonable doubt that the defendant is guilty of the greater crime, and you also agree that the People have proved beyond a reasonable doubt that he is guilty of the lesser crime, complete and sign

26

the verdict form for not guilty of the greater crime and the verdict form for guilty [of] the lesser crime.

"If all of you agree that the People have not proved beyond a reasonable doubt that the defendant is guilty of the greater or lesser crime, complete and sign the verdict form for not guilty of the greater crime and the verdict form for the not guilty [of] the lesser crime.

"If all of you agree that the People have not proved beyond a reasonable doubt that the defendant is guilty of the greater crime, but all of you cannot agree on a verdict for the lesser crime, complete and sign the verdict form for not guilty of the greater crime and inform me only that you cannot reach an agreement about the lesser crime."

2

In his closing argument, the prosecutor told the jury, "[T]hat last jury instruction about greater crime and lesser crime is extremely confusing. So here is the easiest way: start with what he's charged with, the greatest crime. And you will know which ones are lesser crimes because it actually says 'lesser included crimes.' The only way you can address the lesser crimes is if you acquit him of not guilty of the greater crime. If you focus on the charged crimes first, that's the logical way to go about it. If you find him guilty of everything you don't have to address that. The only time you address lessers is if you find him not guilty of the greater crime. Then you start moving your way down. It prevents you from going upwards. It's kind of backwards starting at the lowest crime. Start with the greatest crime and then move down."

27

Defense counsel, whose main defense strategy was to persuade the jury Scroggins was guilty of lesser offenses, did not object to the prosecutor's remarks and largely parroted the prosecutor's approach. For example, as to robbery charge, she told the jury, "You have to get not guilty on the robbery before you can even get the lesser included offense." She made substantially similar remarks regarding other charges for which there were lesser included offenses.

B

Scroggins contends we must reverse his convictions for counts 2, 4, 5 and 7 because the prosecutor's remarks about how the jury should approach its deliberations on the greater and lesser offenses misstated California law allowing the jury to consider crimes in any order and constituted prejudicial misconduct. We conclude there is no merit to this contention.

Our review of prosecutorial error claims is guided by well-established rules. "A prosecutor's conduct violates a defendant's federal constitutional rights when it comprises a pattern of conduct so egregious that it infects ' "the trial with unfairness as to make the resulting conviction a denial of due process." [Citation.]' [Citation.] The focus of the inquiry is on the effect of the prosecutor's conduct on the defendant, not on the intent or bad faith of the prosecutor. [Citation.] Conduct that does not render a trial fundamentally unfair is error under state law only when it involves ' " 'the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury.' " ' " (*People v. Bennett* (2009) 45 Cal.4th 577, 594–595.)

Under California law, a jury may consider greater and lesser offenses in any order, but it cannot return a verdict on a lesser offenses unless it first acquits on the greater offense. (*People v. Anderson* (2009) 47 Cal.4th 92, 114.) Scroggins does not dispute the trial court properly instructed the jury on this aspect of the law. We presume the jury followed the trial court's instructions. (*People v. Pearson* (2013) 56 Cal.4th 393, 440.)

Scroggins has not rebutted this presumption because he has not shown the prosecutor countermanded the trial court's instructions. Considered in context, the prosecutor's remarks simply paraphrased and reinforced the part of the law requiring the jury to return a verdict on the greater offense before returning a verdict on a lesser offense. Moreover, in her closing remarks, defense counsel encouraged the jury to follow the very same approach while concurrently emphasizing the reasons why the jury should immediately reject greater offenses in favor of lesser offenses. Thus, even if the prosecutor's remarks were not a completely accurate reflection of the law, Scroggins has not shown the remarks amounted to a deceptive or reprehensible method of persuasion or that he was prejudiced by them.

Finally, a claim of prosecutorial error in closing argument is generally waived absent a timely objection. (*People v. Pearson*, *supra*, 56 Cal.4th 393 at p. 440.) As we have addressed this issue on the merits, we need not address Scroggins's contention his trial counsel provided ineffective assistance by failing to preserve this issue for appeal. Nonetheless, we note defense counsel's encouragement of the same approach suggests any failure to object was tactical and not ineffective assistance. (*People v. Collins* (2010)

29

49 Cal.4th 175, 233 [as deciding whether to object is inherently tactical, the failure to object will rarely establish ineffective assistance of counsel].)

## VII

### *Cumulative Error*

Scroggins contends we must reverse his convictions because the cumulative impact of the preceding trial court errors deprived him of due process of law and a fair trial. We have identified only one error, which we remedied by reducing Scroggins's conviction for count 1. As there were no other errors to accumulate, we must necessarily reject this contention. (*People v. Whalen* (2013) 56 Cal.4th 1, 92; *People v. McKinzie* (2012) 54 Cal.4th 1302, 1357.)

## DISPOSITION

The judgment is modified to reduce Scroggins's conviction in count 1 from commission of a forcible lewd act with a child (§ 288, subd. (b)(1)) to attempted commission of a lewd act with a child (§§ 288, subd. (b)(1), 664). In all other respects, the judgment is affirmed.

McCONNELL, P. J.

WE CONCUR:

HALLER, J.

IRION, J.

30